1

2

3

4

5

6

7

8                           UNITED STATES DISTRICT COURT

9                     FOR THE EASTERN DISTRICT OF CALIFORNIA

10

11    SALVADOR RAMON MARTINEZ,                    No.  2:19-cv-2477-MCE-EFB P

12                    Petitioner,

13         v.                                     FINDINGS AND RECOMMENDATIONS

14    STUART SHERMAN,

15                    Respondent.

16

17         Petitioner is a California state prisoner who, proceeding with counsel, brings an

18    application for a writ of habeas corpus pursuant to 28 U.S.C. § 2254.  In 2016 and in the

19    Sacramento County Superior Court, petitioner was convicted of: (1) second degree murder (Pen.

20    Code § 187, subd. (a)) and (2) personally discharging a firearm in the commission of the crime

21    (§ 12022.53, subds. (b)-(d)).

22         Petitioner now argues that his rights were violated because: (1) the provocative act theory

23    of murder used to convict him was not supported by substantial evidence; (2) the trial court erred

24    in omitting a jury instruction on an element of the provocative act theory of murder; and (3) the

25    trial court erred in instructing on adoptive admission with CALCRIM 357, thereby lightening the

26    prosecutor's burden of proof.

27         For the reasons stated hereafter, the petition should be denied.

28    /////

FACTUAL BACKGROUND

The court has reviewed the state appellate court's summation of the relevant facts. Having determined that it is consistent with the record, it is reproduced here:

> Early on July 13, 2014, there was a wild shoot-out by the Hookah Lounge near Fulton Avenue and Arden Way in Sacramento. Tyrell Hall was killed and two people were injured.
>
> . . .
>
> A number of people were enjoying a Saturday night on the town, inside and in front of the Hookah Lounge. Defendant was celebrating his 19th birthday there with his friends, including Hall. A disturbance broke out in a Target parking lot across the street. Defendant had nothing to do with that disturbance. But for reasons not entirely clear, the disturbance later evolved into a multi-shooter gun battle outside of the lounge. In the aftermath, officers found 29 bullet casings in the area, fired from five different pistols.
>
> Viewing the evidence in the light favorable to the verdict (*People v. Abilez* (2007) 41 Cal.4th 472, 504), Hall was killed by a shot fired by codefendant Tara Dania.[1] Defendant had been shooting at Dania, and Dania fired back at defendant. Dania wounded defendant and killed Hall, an uninvolved bystander.
>
> The defense theory was that defendant himself did not fire any shots. However, a .380 Beretta pistol was found under his car, with his blood on it, and his blood was also found on a .380 shell casing, one of seven nearby casings fired from the same pistol. The other pistols fired that night were nine-millimeter or .40-caliber weapons. Defendant was shot through his hand and the bullet went in a straight line to his elbow, suggesting his hand was extended (such as by pointing a firearm) when he was shot. The jury could infer defendant had fired the .380 pistol and hidden it after he was shot in the hand.
>
> After the disturbance began--but before any gunfire--the lounge's uniformed and visibly armed security guard told some of the troublemakers to leave; defendant then approached the guard and told him that if he needed help, "I have your back." The jury rationally could draw the inference from this unusual behavior that defendant, too, was armed, and therefore capable of assisting the armed guard if the disturbance escalated.[2]

---

[1] [**footnote in original text**] Also charged were Dania, Frederick Lamont Davis, Frank Eugene Jackson, and James Wallace. Dania argued self-defense and was acquitted; the dispositions of the remaining defendants' cases are not relevant to this appeal.

[2][**footnote in original text**] Inexplicably, the guard fired only into the air in this urban area during the gunfight. (Cf. Pen. Code, § 246.3.).

Further, the jury rationally could find defendant hid the pistol under his parked car, and that that act, and his denial that he drove his car to the lounge when he was questioned in the hospital, evidenced consciousness of guilt. There was gunshot residue found on his shirt, although that could have been caused by his being near a fired gun. Finally, there was evidence of a purported adoptive admission, discussed more fully in Part III, *post*. In short, when detectives talked to defendant at his home, they told him they found a gun under his car, but he remained silent.

In argument, the prosecutor described his general theory as follows. Referencing the brevity of the incident and the small area in which it occurred, he likened it to "the OK Corral," and argued "Hall is dead because [defendant] and Mr. Dania play out their own little [duel] in a crowded area in front of any number of innocent persons and, because of that," Hall died. "Dania and . . . [defendant] decide that they are going to play cowboy. This ain't the Wild West, folks. But that's exactly what is going on out here in front of the Hookah Lounge." Defendant's act of approaching the guard and offering aid showed he was armed and if trouble began he wanted to be part of it. Defendant began firing at Dania, who returned fire. Defendant lied about driving his car to the lounge, and he ditched the pistol found under it, which had his blood on it because he had been shot through the hand toward his elbow, and was almost hit by a second bullet that went through his beanie. The incoming shots, "one through the beanie . . . one in his arm," showed that defendant had his arm extended in a "[s]hooter stance." The gunshot residue on his shirt, while not conclusive, added to the evidence he fired a pistol.

As for legal culpability, the prosecutor first argued both defendant and Dania caused Hall's death. "It's a hail of bullets. It is back and forth. Dania and [defendant] shooting away, which sets in motion a chain of events that produces, as a direct, natural and probable consequence, the death of" Hall. Defendant was "just as much a cause of" Hall's death as Dania because they were "squared up" and defendant was drawing Dania's fire "right to him and right to Mr. Hall." Defendant acted with malice and without justification. The jury could find express malice based on defendant shooting to kill Dania, but did not have to, because the facts showed implied malice based on the commission of an act knowing it is naturally and probably dangerous to human life, shooting a gun at a person was a dangerous act, and defendant shot several times at Dania, in conscious disregard of human life. "[Defendant] didn't care, Dania didn't care. They were too busy shooting away at each other" to care about human life. Defendant's shots, in combination with Dania's return fire, was a substantial factor in Hall's death, which was the natural and probable consequence of their gunplay in a limited space.

The prosecutor then discussed "another theory of liability" that applied only to defendant, emphasizing that there were two distinct paths by which the jury could return a murder verdict against him. The prosecutor outlined the elements of the provocative acts theory consistent with the pattern instruction (CALCRIM No. 560), and described how the jury could find how the evidence satisfied those elements. "In this case, what he is doing is shooting a weapon, okay.

3

But in committing an intentional act, a provocative act, [defendant] knew that the natural and probable consequences of that act were dangerous to life" and in response to his act "Mr. Dania fires and kills Mr. Hall, and [if] you find that the death was the natural and probable consequence of [defendant's] act, then [defendant] is guilty." "[I]f you, as the finder of fact, find that [defendant] was the provocateur of that exchange, and . . . it's a different issue and it's separated from whatever is going on out on the street. The exchange that is being provoked, if any, is the exchange of actual bullets back and forth [i.e., between defendant and Dania]. [¶] And if you, as the fact finder, find [defendant] was the provocative [actor] in that particular exchange, bullet to bullet, then this theory could and can apply to him." (Italics added.) "[I]f you find that [defendant] instigated the . . . bullets firing back and forth [i.e., those exchanged by defendant and Dania], then that is a theory that could apply to him."

Defense counsel argued Dania came armed "ready for something to happen." When something did happen, Dania fired towards where he claimed to have seen flashes, at a "black figure" or "dark figure" seen "clearly shooting" on a video recording, but Dania instead hit defendant and Hall. Counsel conceded there was only one gun fired from the area towards which Dania returned fire, but argued defendant was not the "dark figure" shooting from the south.[3] Counsel also pointed to the testimony of a witness who described the first shooter in a way that did not match defendant. Later counsel argued defendant "did not begin the chain of events" but merely got shot because he was present.

As for the other evidence, defense counsel argued the small amount of defendant's blood on the pistol could have been a result of a transfer, during all of the confusion at the scene, which also could have caused the .380 shell casings to be kicked around. The small amount of gunshot residue on defendant's shirt could have been the result of a transfer, or standing near a fired gun. When defendant lied about driving his car to the lounge that night, he was in pain at the hospital and in shock at his friend's death. His claimed admission about the gun was not an admission: All the jury had heard was a detective's recollection of what was said, and how it had been said, and that did not establish an adoptive admission. Defendant could have understood that the detectives did not want to ask him about the gun in front of his mother, but would ask him about it later. (See Part III, *post*.)

In response, the People partly argued "Mr. Dania and [defendant] are the only two people in that parking lot [who] aren't ducking and running. . . . And there's a good reason for that, because they are the ones shooting the firearms." There was a lot of blood on the .380 Beretta, the technician merely tested one area, and to suppose it was just bad luck that that one spot was the only part that had defendant's blood, instead of some unknown shooter's blood, was "absolutely ludicrous." The lie in the hospital about driving was no mistake, and

---

[3] [**footnote in original text**] The video recordings did not clearly identify defendant as a shooter, but evidently showed the shooting began from the south.

regardless of the circumstances at defendant's home when he was told about the gun found under his car, a reasonable person would have spoken up--unless he felt guilty.

ECF No. 11-15 at 1-6.

### STANDARDS GOVERNING HABEAS RELIEF UNDER THE AEDPA

I.    Applicable Statutory Provisions

28 U.S.C. § 2254, as amended by the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), provides in relevant part as follows:

(d) An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a state court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim -

(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

(2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

Section 2254(d) constitutes a "constraint on the power of a federal habeas court to grant a state prisoner's application for a writ of habeas corpus." *(Terry) Williams v. Taylor*, 529 U.S. 362, 412 (2000).  It does not, however, "imply abandonment or abdication of judicial review," or "by definition preclude relief." *Miller El v. Cockrell*, 537 U.S. 322, 340 (2003).  If either prong (d)(1) or (d)(2) is satisfied, the federal court may grant relief based on a de novo finding of constitutional error. *See Frantz v. Hazey*, 533 F.3d 724, 736 (9th Cir. 2008) (en banc).

The statute applies whenever the state court has denied a federal claim on its merits, whether or not the state court explained its reasons. *Harrington v. Richter*, 562 U.S. 86, 99-100 (2011).  State court rejection of a federal claim will be presumed to have been on the merits absent any indication or state law procedural principles to the contrary. *Id.* at 784-785 (citing *Harris v. Reed*, 489 U.S. 255, 265 (1989) (presumption of a merits determination when it is unclear whether a decision appearing to rest on federal grounds was decided on another basis)). "The presumption may be overcome when there is reason to think some other explanation for the state court's decision is more likely." *Id.* at 785.

A.      "<u>Clearly Established Federal Law</u>"

The phrase "clearly established Federal law" in § 2254(d)(1) refers to the "governing legal principle or principles" previously articulated by the Supreme Court.  *Lockyer v. Andrade*, 538 U.S. 63, 71 72 (2003).  Only Supreme Court precedent may constitute "clearly established Federal law," but courts may look to circuit law "to ascertain whether…the particular point in issue is clearly established by Supreme Court precedent."  *Marshall v. Rodgers*, 569 U.S. 58, 64 (2013).

B.      "<u>Contrary To</u>" Or "<u>Unreasonable Application Of</u>" Clearly Established
        Federal Law

Section 2254(d)(1) applies to state court adjudications based on purely legal rulings and mixed questions of law and fact.  *Davis v. Woodford*, 384 F.3d 628, 637 (9th Cir. 2003).  The two clauses of § 2254(d)(1) create two distinct exceptions to AEDPA's limitation on relief.  *Williams*, 529 U.S. at 404-05 (the "contrary to" and "unreasonable application" clauses of (d)(1) must be given independent effect, and create two categories of cases in which habeas relief remains available).

A state court decision is "contrary to" clearly established federal law if the decision "contradicts the governing law set forth in [the Supreme Court's] cases."  *Id.* at 405.  This includes use of the wrong legal rule or analytical framework.  "The addition, deletion, or alteration of a factor in a test established by the Supreme Court also constitutes a failure to apply controlling Supreme Court law under the 'contrary to' clause of the AEDPA."  *Benn v. Lambert*, 283 F.3d 1040, 1051 n.5 (9th Cir. 2002).  *See, e.g., Williams*, 529 U.S. at 391, 393 95 (Virginia Supreme Court's ineffective assistance of counsel analysis "contrary to" *Strickland*[4]  because it added a third prong unauthorized by *Strickland*); *Crittenden v. Ayers*, 624 F.3d 943, 954 (9th Cir. 2010) (California Supreme Court's *Batson*[5]  analysis "contrary to" federal law because it set a higher bar for a prima facie case of discrimination than established in *Batson* itself); *Frantz*, 533

[4] *Strickland v. Washington*, 466 U.S. 668 (1984).

[5] *Batson v. Kentucky*, 476 U.S. 79 (1986).

F.3d at 734 35 (Arizona court's application of harmless error rule to *Faretta*[6] violation was contrary to U.S. Supreme Court holding that such error is structural).  A state court also acts contrary to clearly established federal law when it reaches a different result from a Supreme Court case despite materially indistinguishable facts.  *Williams*, 529 U.S. at 406, 412 13; *Ramdass v. Angelone*, 530 U.S. 156, 165-66 (2000) (plurality op'n).

A state court decision "unreasonably applies" federal law "if the state court identifies the correct rule from [the Supreme Court's] cases but unreasonably applies it to the facts of the particular state prisoner's case."  *Williams*, 529 U.S. at 407 08.  It is not enough that the state court was incorrect in the view of the federal habeas court; the state court decision must be objectively unreasonable.  *Wiggins v. Smith*, 539 U.S. 510, 520 21 (2003).  This does not mean, however, that the § (d)(1) exception is limited to applications of federal law that "reasonable jurists would all agree is unreasonable."  *Williams*, 529 U.S. at 409 (rejecting Fourth Circuit's overly restrictive interpretation of "unreasonable application" clause).  State court decisions can be objectively unreasonable when they interpret Supreme Court precedent too restrictively, when they fail to give appropriate consideration and weight to the full body of available evidence, and when they proceed on the basis of factual error.  *See, e.g., Williams*, 529 U.S. at 397-98; *Wiggins,* 539 U.S. at 526 28 & 534; *Rompilla v. Beard*, 545 U.S. 374, 388 909 (2005); *Porter v. McCollum*, 558 U.S. 30, 42 (2009).

The "unreasonable application" clause permits habeas relief based on the application of a governing principle to a set of facts different from those of the case in which the principle was announced.  *Lockyer*, 538 U.S. at 76.  AEDPA does not require a nearly identical fact pattern before a legal rule must be applied.  *Panetti v. Quarterman*, 551 U.S. 930, 953 (2007).  Even a general standard may be applied in an unreasonable manner.  *Id.*  In such cases, AEDPA deference does not apply to the federal court's adjudication of the claim.  *Id.* at 948.

Review under § 2254(d) is limited to the record that was before the state court.  *Cullen v. Pinholster*, 563 U.S. 170, 180-81 (2011).  The question at this stage is whether the state court

---

[6] *Faretta v. California*, 422 U.S. 806 (1975).

1   reasonably applied clearly established federal law to the facts before it.  *Id.*  In other words, the

2   focus of the § 2254(d) inquiry is "on what a state court knew and did."  *Id.* at 1399.

3     Where the state court's adjudication is set forth in a reasoned opinion, § 2254(d)(1) review

4   is confined to "the state court's actual reasoning" and "actual analysis."  *Frantz*, 533 F.3d at 738

5   (emphasis in original).  A different rule applies where the state court rejects claims summarily,

6   without a reasoned opinion.  In *Harrington*, *supra*, the Supreme Court held that when a state court

7   denies a claim on the merits but without a reasoned opinion, the federal habeas court must

8   determine what arguments or theories may have supported the state court's decision, and subject

9   those arguments or theories to § 2254(d) scrutiny.  *Harrington*, 562 U.S. at 101-102.

10       C. "<u>Unreasonable Determination of The Facts</u>"

11     Relief is also available under AEDPA where the state court predicated its adjudication of

12   a claim on an unreasonable factual determination.  Section 2254(d)(2).  The statute explicitly

13   limits this inquiry to the evidence that was before the state court.

14     Even factual determinations that are generally accorded heightened deference, such as

15   credibility findings, are subject to scrutiny for objective reasonableness under § 2254(d)(2).  For

16   example, in *Miller El v. Dretke*, 545 U.S. 231 (2005), the Supreme Court ordered habeas relief

17   where the Texas court had based its denial of a *Batson* claim on a factual finding that the

18   prosecutor's asserted race neutral reasons for striking African American jurors were true.

19   *Miller El*, 545 U.S. at 240.

20     An unreasonable determination of facts exists where, among other circumstances, the

21   state court made its findings according to a flawed process – for example, under an incorrect

22   legal standard, or where necessary findings were not made at all, or where the state court failed to

23   consider and weigh relevant evidence that was properly presented to it.  *See Taylor v. Maddox*,

24   366 F.3d 992, 999 1001 (9th Cir.), *cert. denied*, 543 U.S. 1038 (2004).  Moreover, if "a state

25   court makes evidentiary findings without holding a hearing and giving petitioner an opportunity

26   to present evidence, such findings clearly result in a 'unreasonable determination' of the facts"

27   within the meaning of § 2254(d)(2).  *Id.* at 1001; accord *Nunes v. Mueller*, 350 F.3d 1045, 1055

28   (9th Cir. 2003) (state court's factual findings must be deemed unreasonable under section

2254(d)(2) because "state court . . . refused Nunes an evidentiary hearing" and findings consequently "were made without . . . a hearing"), *cert. denied*, 543 U.S. 1038 (2004); *Killian v. Poole*, 282 F.3d 1204, 1208 (9th Cir. 2002) ("state courts could not have made a proper determination" of facts because state courts "refused Killian an evidentiary hearing on the matter"), *cert. denied*, 537 U.S. 1179 (2003).

A state court factual conclusion can also be substantively unreasonable where it is not fairly supported by the evidence presented in the state proceeding. *See, e.g., Wiggins*, 539 U.S. at 528 (state court's "clear factual error" regarding contents of social service records constitutes unreasonable determination of fact); *Green v. LaMarque*, 532 F.3d 1028 (9th Cir. 2008) (state court's finding that the prosecutor's strike was not racially motivated was unreasonable in light of the record before that court); *Bradley v. Duncan*, 315 F.3d 1091, 1096 98 (9th Cir. 2002)  (state court unreasonably found that evidence of police entrapment was insufficient to require an entrapment instruction), *cert. denied*, 540 U.S. 963 (2003).

II.     The Relationship Of § 2254(d) To Final Merits Adjudication

To prevail in federal habeas proceedings, a petitioner must establish the applicability of one of the § 2254(d) exceptions and also must also affirmatively establish the constitutional invalidity of his custody under pre AEDPA standards. *Frantz v. Hazey*, 533 F.3d 724 (9th Cir. 2008) (en banc).  There is no single prescribed order in which these two inquiries must be conducted. *Id.* at 736-37.  The AEDPA does not require the federal habeas court to adopt any one methodology. *Lockyer v. Andrade*, 538 U.S. 63, 71 (2003).

In many cases, § 2254(d) analysis and direct merits evaluation will substantially overlap. Accordingly, "[a] holding on habeas review that a state court error meets the ' 2254(d) standard will often simultaneously constitute a holding that the [substantive standard for habeas relief] is satisfied as well, so no second inquiry will be necessary." *Frantz*, 533 F.3d at 736.  In such cases, relief may be granted without further proceedings. *See, e.g., Goldyn v. Hayes*, 444 F.3d 1062, 1070 71 (9th Cir. 2006) (finding § 2254(d)(1) unreasonableness in the state court's conclusion that the state had proved all elements of the crime, and granting petition); *Lewis v. Lewis*, 321 F.3d 824, 835 (9th Cir. 2003) (finding § 2254(d)(1) unreasonableness in the state court's failure

1   to conduct a constitutionally sufficient inquiry into a defendant's jury selection challenge, and

2   granting petition); *Williams v. Ryan*, 623 F.3d 1258 (9th Cir. 2010) (finding § 2254(d)(1)

3   unreasonableness in the state court's refusal to consider drug addiction as a mitigating factor at

4   capital sentencing, and granting penalty phase relief).

5          In other cases, a petitioner's entitlement to relief will turn on legal or factual questions

6   beyond the scope of the § 2254(d) analysis.   In such cases, the substantive claim(s) must be

7   separately evaluated under a de novo standard.  *Frantz*, 533 F.3d at 737.  If the facts are in dispute

8   or the existence of constitutional error depends on facts outside the existing record, an evidentiary

9   hearing may be necessary.  *Id.* at 745; *see also Earp*, 431 F.3d 1158 (remanding for evidentiary

10  hearing after finding § 2254(d) satisfied).

11                                  DISCUSSION

12  I.      Sufficiency of the Evidence; Provocative Acts Doctrine

13         Petitioner, as noted *supra*, argues insufficient evidence supported his conviction under the

14  Provocative Acts Doctrine.

15          A.      State Court Decision

16         The state court of appeal rejected this claim on direct review:

17              Defendant contends no substantial evidence supports his murder
18              conviction based on a provocative acts theory. We reject this claim
                on procedural grounds.

19              Provocative acts murder is not itself a crime, it is "a descriptive
20              category or shorthand formula denoting certain circumstances under
                which a defendant comes within the statutory definition of murder
21              when his or her unlawful conduct provokes another into committing
                the fatal act." (*People v. Cervantes* (2001) 26 Cal.4th 860, 867, fn.
                10 (*Cervantes*).) It refers "to a subset of intervening-act homicides in
22              which the defendant's conduct provokes an intermediary's violent
                response that causes someone's death." (*People v. Gonzalez* (2012)
23              54 Cal.4th 643, 649, fn. 2; *see People v. Concha* (2009) 47 Cal.4th
                653, 663.) It describes a set of facts in which the defendant acts so as
24              to provoke another person into killing someone. (*Gonzalez*, at p. 649,
                fn. 2; *Cervantes*, at p. 867.) It is in effect a "subset of implied
25              malice." (Levenson & Ricciardulli, Cal. Crim. Law (The Rutter
                Group 2017-2018) Homicide, § 5.9, p. 5-20 (Levenson &
26              Ricciardulli).)

27              As the Attorney General points out, the trial court instructed the jury
                on second degree murder based on two theories. First, defendant
28              acted either with intent to kill (express malice) or conscious

                                        10

indifference to human life (implied malice), and his act was a substantial factor in Hall's death, which was the natural and probable consequence of defendant's actions. Second--and *separately*--the trial court instructed the jury on the provocative acts theory. As previously explained, the prosecutor argued each of these two theories to the jury.

We have no idea which theory the jury found true; indeed, it is possible the jury found both theories were true. This obviates any need to address defendant's claim, which attacks the sufficiency of the evidence only as to one of the two theories.

" 'Where the jury considers both a factually sufficient and a factually insufficient ground for conviction, and it cannot be determined on which ground the jury relied, we affirm the conviction unless there is an affirmative indication that the jury relied on the invalid ground.' " (*People v. Thompson* (2010) 49 Cal.4th 79, 119; *see People v. Sanchez* (2001) 26 Cal.4th 834, 851 (*Sanchez*); *People v. Guiton* (1993) 4 Cal.4th 1116, 1129 ["If the inadequacy of proof is purely factual . . . reversal is not required whenever a valid ground for the verdict remains, absent an affirmative indication in the record that the verdict actually did rest on the inadequate ground"].)

Defendant does not acknowledge the existence of the alternate theory presented to the jury, and has presented no argument that there is any indication in the record--affirmative or otherwise--that the jury relied on the claimed factually insufficient ground, viz., the provocative acts theory of murder.[7] Given this scenario, even if the evidence of provocative acts murder fell short, we would presume the jury rendered its verdict on the alternate theory. Defendant does not argue insufficient evidence on that theory, and we will not make arguments for him. (*See People v. Stanley* (1995) 10 Cal.4th 764, 793.)

We note that the case for express malice was strong. In a somewhat analogous case, two men engaged in a gun battle, an innocent bystander was killed by one bullet, and both men were convicted of first degree murder. (*Sanchez*, *supra*, 26 Cal.4th at pp. 838-839.) In rejecting the view that the verdict as to one of the men must have been based on a provocative acts theory, our Supreme Court explained:

"Defendant and Gonzalez engaged one another in a gun battle on a public street in broad daylight, during which each plainly attempted to murder the other. Given that their respective claims of self-defense were rejected by the jury, express malice on the part of each was patently established. In contrast, the definition of provocative act murder in the instruction given would have been triggered by the finding of a provocative act that gave rise to an inference of implied

---

[7] [**footnote four in original text**] Appointed appellate counsel filed a 103-page opening brief, but no reply brief, thus she fails to address the Attorney General's procedural refutation of this argument. We note with disapproval that counsel incorrectly claims the provocative acts theory was the only theory presented to the jury by the prosecutor, which indicates at best that she has significantly misread the appellate record.

malice. Given that defendant and Gonzalez were each convicted of first degree murder on facts plainly establishing express malice, there is no sound basis on which to conclude that the jury rested defendant's first degree murder verdict on a finding that he committed a provocative act with implied malice." (*Sanchez, supra*, 26 Cal.4th at p. 852.)

Of course, in this case defendant was convicted of second degree murder, and Dania was acquitted outright, but evidently based on the justification of self-defense, not because the jury doubted whether Dania lacked the intent to kill. Daria's intent was shown in part by the fact that his return fire hit defendant and killed Hall, who was standing next to defendant. The fact remains that the evidence supports the inference that defendant began firing at Dania first, an act the jury could rationally have found showed express malice (intent to kill), leading Dania to return fire in a confined area, causing Hall's death on a natural and probable consequences theory. On these facts we cannot assume the verdict was based on the alternative provocative acts theory.

Accordingly, we need not address whether sufficient evidence supports the murder verdict based on a theory of provocative act murder.[8]

ECF No. 11-15 at 6-9.  Petitioner raised this claim in a petition for review to the California Supreme Court (ECF No. 11-16) which was summarily denied (ECF No. 11-17).

### B.   Legal Standards

#### i.   Sufficiency of the Evidence

The Due Process Clause "protects the accused against conviction except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged." *In re Winship*, 397 U.S. 358, 364 (1970).  There is sufficient evidence to support a conviction if, "after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979).  "[T]he dispositive question under

---

[8] [**footnote five in original text**] At various points defendant refers to charges against other persons and the results thereof to bolster arguments about the evidence. What happened to other counts is not directly relevant, both because the jury was instructed to separately consider the evidence as to each defendant and decide each charge separately, and because normally an acquittal on any count can be the product of jury confusion, lenity, or compromise. (*See People v. Lewis* (2001) 25 Cal.4th 610, 656; *People v. Hussain* (2014) 231 Cal.App.4th 261, 273; *People v. Pahl* (1991) 226 Cal.App.3d 1651, 1656-1657.) But viewing the evidence in the light most favorable to the verdict, we must infer Dania acted in self-defense vis à vis defendant, an implied finding supported by Dania's testimony.

1    *Jackson* is 'whether the record evidence could reasonably support a finding of guilt beyond a

2    reasonable doubt.'" *Chein v. Shumsky*, 373 F.3d 978, 982 (9th Cir. 2004) (quoting *Jackson*, 443

3    U.S. at 318).  Put another way, "a reviewing court may set aside the jury's verdict on the ground

4    of insufficient evidence only if no rational trier of fact could have agreed with the jury." *Cavazos*

5    *v. Smith*, 565 U.S. 1, 2 (2011). Sufficiency of the evidence claims in federal habeas proceedings

6    must be measured with reference to substantive elements of the criminal offense as defined by

7    state law. *Jackson*, 443 U.S. at 324 n.16.

8              In conducting federal habeas review of a claim of insufficient evidence, "all evidence

9    must be considered in the light most favorable to the prosecution." *Ngo v. Giurbino*, 651 F.3d

10   1112, 1115 (9th Cir. 2011).  "*Jackson* leaves juries broad discretion in deciding what inferences

11   to draw from the evidence presented at trial," and it requires only that they draw "'reasonable

12   inferences from basic facts to ultimate facts.'" *Coleman v. Johnson*, 566 U.S. 650, 655 (2012)

13   (per curiam ) (citation omitted). "'Circumstantial evidence and inferences drawn from it may be

14   sufficient to sustain a conviction.'" *Walters v. Maass*, 45 F.3d 1355, 1358 (9th Cir. 1995)

15   (citation omitted).

16             If the record supports conflicting inferences, the reviewing court "must presume — even

17   if it does not affirmatively appear in the record — that the trier of fact resolved any such conflicts

18   in favor of the prosecution, and must defer to that resolution." *McDaniel v. Brown*, 558 U.S. 120,

19   133 (2010) (per curiam) (quoting *Jackson*, 443 U.S. at 326).  And juries have broad discretion in

20   deciding what inferences to draw from the evidence presented at trial.  This court may not

21   "impinge[ ] on the jury's role as factfinder," or engage in "fine-grained factual parsing."

22   *Coleman*, 566 U.S. at 655.  Under *Jackson*, the Court need not find that the conclusion of guilt

23   was compelled, only that it rationally could have been reached.  *Drayden v. White*, 232 F.3d 704,

24   709-10 (9th Cir. 2000).

25             "A petitioner for a federal writ of habeas corpus faces a heavy burden when challenging

26   the sufficiency of the evidence used to obtain a state conviction on federal due process grounds."

27   *Juan H. v. Allen*, 408 F.3d 1262, 1274 (9th Cir. 2005).  Because this case is governed by the Anti-

28   Terrorism and Effective Death Penalty Act, this court owes a "double dose of deference" to the

1    decision of the state court.  *Long v. Johnson*, 736 F.3d 891, 896 (9th Cir. 2013) (quoting *Boyer v.*

2    *Belleque*, 659 F.3d 957, 960 (9th Cir. 2011)).  *See also Coleman*, 566 U.S. at 651 ("*Jackson*

3    claims face a high bar in federal habeas proceedings because they are subject to two layers of

4    judicial deference."); *Kyzar v. Ryan*, 780 F.3d 940, 943 (9th Cir. 2015) (same).

5                    ii.    Procedural Default

6           "A state court's invocation of a procedural rule to deny a prisoner's claims precludes

7    federal review of the claims if, among other requisites, the state procedural rule is a nonfederal

8    ground adequate to support the judgment and the rule is firmly established and consistently

9    followed."  *Martinez v. Ryan*, 566 U.S. 1, 9 (2012).  And the Supreme Court has held that:

10                       In all cases in which a state prisoner has defaulted his federal claims
                         in state court pursuant to an independent and adequate state
11                       procedural rule, federal habeas review of the claims is barred unless
                         the prisoner can demonstrate cause for the default and actual
12                       prejudice as a result of the alleged violation of federal law, or
                         demonstrate that failure to consider the claims will result in a
13                       fundamental miscarriage of justice.

14   *Coleman v. Thompson*, 501 U.S. 722, 750 (1991).

15                    C.    Analysis

16          Here, the state appellate court explicitly stated that it was disposing of this claim on

17   procedural grounds.  ECF No. 11-15 at 6.  And to reiterate, it noted that the jury in petitioner's

18   trial was instructed on two separate theories on second degree murder:

19                       First, defendant acted either with intent to kill (express malice) or
                         conscious indifference to human life (implied malice), and his act
20                       was a substantial factor in Hall's death, which was the natural and
                         probable consequence of defendant's actions. Second--and
21                       *separately*--the trial court instructed the jury on the provocative acts
                         theory. As previously explained, the prosecutor argued each of these
22                       two theories to the jury.

23   *Id.* at 7.  On direct appeal, however, petitioner did not attack the sufficiency of the evidence

24   underlying the first theory and, as the appellate court noted, it could not be determined which

25   theory the jury had relied upon to convict petitioner.  *Id.* ("We have no idea which theory the jury

26   found true; indeed, it is possible the jury found both theories were true. This obviates any need to

27   address defendant's claim, which attacks the sufficiency of the evidence only as to one of the two

28   theories.").  The immediate petition acknowledges the procedural grounds upon which the

                                                     14

1   appellate court rested its decision, but argues that the procedural bar was incorrectly applied

2   insofar as: (1) this was a trial with multiple defendants; (2) that the jury was instructed as to

3   petitioner's guilt *only* on the provocative act theory; and (3) that the jury was instructed on the

4   theory of transferred intent only as to Dania.   ECF No. 1 at 47.   The court, having reviewed the

5   record, disagrees.   At the outset, it notes that the trial judge instructed the jury that "[u]nless I tell

6   you otherwise, all instructions apply to each defendant."   ECF No. 11-3 at 39.   The trial court

7   went on to instruct the jury as to express and implied malice with regard to *both* petitioner and

8   Dania.   *Id.* at 66-67.   Then, separately, it also gave instructions on the provocative act theory

9   which applied only to petitioner.   *Id.* at 69-70.   Thus, the appellate court's reading of the record

10   appears to be correct and the instructions plainly permitted the jury to convict petitioner on the

11   malice theory if they found the evidence sufficient to justify it.

12        To the extent petitioner *now* contends that the evidence was insufficient to sustain a

13   conviction on the malice theory, that argument is forfeited for failure to raise it before the

14   appropriate state court.   He did not, as the appellate court noted, raise any argument on that point

15   in his briefing on direct appeal.[9]   ECF No. 11-15 at 7 ("Defendant does not acknowledge the

16   existence of the alternate theory presented to the jury . . . Given this scenario, even if the evidence

17   of provocative acts murder fell short, we would presume the jury rendered its verdict on the

18   alternate theory. Defendant does not argue insufficient evidence on that theory, and we will not

19   make arguments for him.").   In any event, as the appellate court stated, the evidence for

20   convicting petitioner under the malice theory was strong.   To wit:

21            [T]he evidence supports the inference that defendant began firing at
             Dania first, an act the jury could rationally have found showed
22            express malice (intent to kill), leading Dania to return fire in a
             confined area, causing Hall's death on a natural and probable
23            consequences theory. On these facts we cannot assume the verdict
             was based on the alternative provocative acts theory.
24

25   ECF No. 11-15 at 8-9.   The court notes that the jury was instructed on the natural and probable

26   ───────────────

27        [9] And petitioner did little justice to this argument in his petition for review to the
     California Supreme Court.   That document raises an argument identical to the one now before this
     court and does not lay out, in any explicit terms, how the malice argument lacked sufficient
28   evidentiary support.   *See* ECF No. 11-16 at 23.

1    consequences theory for both defendants.  ECF No. 11-3 at 68.  Thus, even if there was

2    insufficient evidence to sustain a provocative acts theory, petitioner cannot show that his

3    constitutional rights were violated.  Indeed, our Supreme Court has explicitly held that "it was no

4    violation of due process that a trial court instructed a jury on two different legal theories, one

5    supported by the evidence, the other not."  *Sochor v. Florida*, 504 U.S. 527, 538 (1992) (citing

6    *Griffin v. United States*, 502 U.S. 46 (1991)).

7            The court acknowledges that there is some question – not raised by either party - as to

8    whether the disposition of this claim by the state appellate court was, in fact, "procedural."  In

9    disposing of the appeal, the appellate court did not rely upon any specific "procedural" rule that

10   this court could glean.  What the appellate court effectively decided - correctly in this court's

11   view - was that petitioner (then defendant) had raised a faulty theory of evidentiary insufficiency.

12   This determination, as with any rejection of a poor or logically incomplete legal argument, could

13   easily be deemed a rejection of its merits.  In any event, this question is ultimately semantic and,

14   for the purposes of this petition, beside the point.  Whether the rejection is classified as

15   procedural or merits based, petitioner is clearly not entitled to relief based on this claim.

16   II.        Omission of Instructions on an Element of Provocative Acts Theory

17           In his second ground for relief, petitioner asserts that the trial court erred in failing to

18   require that the jury find that petitioner was the instigator of events causing the victim's death.

19                   A.        State Court Decision

20   The state court of appeal rejected this claim on direct review:

21           Defendant contends the pattern instruction on provocative acts
             murder (CALCRIM No. 560) is deficient because it does not require
22           the jury to find "that appellant was the instigator of events causing
             Hall's death."  We disagree that the jury should have been instructed
23           that it was required to find defendant started the dispute at Target in
             order to find him liable on a provocative acts theory, or as counsel
24           puts it, that "instigating the [entire] chain of events" is an element of
             the theory.[10]
25
     ───────────────────────

26           [10] [**footnote six in original text**] We must address this issue on the merits if properly
     raised, because if the jury was misinstructed on one of two theories of liability, it was a legally
27   insufficient theory. (*See People v. Guiton*, supra, 4 Cal.4th at pp. 1128-1131 [not resolving the
     exact standard of prejudice].) We note, however, that the claim raised on appeal does not match
28

                                                    16

We disagree with defendant's interpretation of the provocative acts theory.

The theory "has traditionally been invoked in cases in which the perpetrator of the underlying crime instigates a gun battle, either by firing the first shot *or otherwise engaging in severe, life-threatening, and usually gun-wielding conduct*, and the police, or a victim of the underlying crime, responds with lethal force by shooting back and killing the perpetrator's accomplice or an innocent bystander." (Levenson & Ricciardulli, *supra*, Homicide, § 5.9, at p. 5-21, italics added.) But we know of no authority requiring that the provocative conduct be *the first step* in a given series of events escalating into lethal violence.

In constructing his argument, defendant takes passages from different cases, divorced from their context, and tries to make the theory something more than it is, as we have put it, "a species of implied malice murder." (*People v. White* (1995) 35 Cal.App.4th 758, 768.) "For the most part, the evolution of this criminal liability has been influenced by other legal doctrines which are not directly applicable here--such as the felony-murder rule or vicarious liability for the acts of a coconspirator or aider and abettor, although there are a few decisions which find a defendant criminally liable outside the bounds of those other doctrines and simply as the proximate cause of the victim's death, as we do here." (*People v. Gardner* (1995) 37 Cal.App.4th 473, 476; see *White*, at pp. 763-765.) What is critical is that the jury be properly instructed on implied malice and proximate cause.

The jury was given the pattern instruction on provocative acts murder, CALCRIM No. 560. As modified to account for the fact that this was not a felony-murder case (e.g., the classic example of a planned robbery gone awry, during which a gun battle ensues), the jury was told that had to find defendant (1) "intentionally did a provocative act;" (2) "knew the natural and probable consequences of the provocative act were dangerous to human life and then acted with conscious disregard for life;" (3) that in response to that act, Dania killed Hall; and (4) "Hall's death was the natural and probable consequence of [defendant's] provocative act." The components of this doctrine were further defined, including what qualified as a provocative act, and what qualified as natural and probable consequences, including the requirement that the provocative act was a substantial factor ("more than a trivial or remote factor" but not necessarily the sole factor) that caused death.

---

the objection lodged in the trial court: Trial counsel argued a separate underlying crime had to be alleged in order to justify instructing the jury on a provocative acts murder theory. When *that* objection was overruled, defense counsel explicitly agreed "with the current version of [CALCRIM No.] 560 as you have given it to us." Despite this arguable forfeiture, and because the Attorney General does not address it as such, we reach the merits of the current claim.

Defendant cites cases presenting the typical fact pattern where a defendant launches the first attack or starts a gun battle, causing a victim or bystander to return fire, killing someone. (See, e.g., *People v. Karapetyan* (2003) 106 Cal.App.4th 609, 618-619; *People v. Gardner*, *supra*, 37 Cal.App.4th at p. 475.) We certainly agree the doctrine may well apply in those fact patterns. (See, e.g., *Cervantes*, *supra*, 26 Cal.4th at p. 867; *People v. Baker-Riley* (2012) 207 Cal.App.4th 631, 633-635.) But that is not the *only* category of cases that may support provocative act murder. *Any* act that a jury finds was done with knowledge that it would naturally and probably cause danger to human life by provoking a deadly response, and is done with conscious disregard for human life, and is a direct and substantial factor in killing someone, satisfies the doctrine. It is well settled that a "defendant's attempts to kill or assault someone with a firearm are by themselves provocative acts likely to draw a deadly response. Thus, there is no need for a separate provocative act to be committed." (*People v. Karapetyan*, *supra*, 106 Cal.App.4th at p. 619; *People v. Gallegos* (1997) 54 Cal.App.4th 453, 461-462 ["Gallegos was in an extremely crowded dance hall, jumped up on the slightly elevated stage crowded with band members, which was inches from patrons dancing on the floor, began shooting at the attempted murder victim, and continued to do so after the latter jumped off the stage and was trying to leave the hall, and even while Gallegos was on the dance floor and was being subdued by other patrons. This satisfies both the 'actus reus' and 'mens rea' elements of provocative murder," "there was a 'high probability' under the circumstances that Gallegos's shooting would elicit a life-threatening response from the attempted murder victim, or from anyone else present, for that matter"].)

Defendant points to a passage in which our Supreme Court, in rejecting provocative acts liability, in part mentioned that the "[d]efendant was not the initial aggressor in the incident that gave rise to the provocative act." (*Cervantes*, *supra*, 26 Cal.4th at p. 872.) But "the critical fact" in that case was that "the actual murderers *were not responding to defendant's provocative act* by shooting back at him or an accomplice, in the course of which someone was killed." (*Id.* at pp. 872-873, italics added.) Instead, shortly after the defendant shot an "Alley Boy" gang-member, members of that gang (not previously an enemy of the defendant's gang) saw a member of the defendant's gang and shot him several times, killing the victim. (*Id.* at p. 863.) Our Supreme Court held that the defendant's acts did not proximately cause the shooting, noting that there was no direct evidence the killers saw him shoot their fellow gang member, he was not present when the victim was shot (*id.* at p. 872), and "[t]he fatal shots were fired, not at the defendant or an accomplice, but instead at a third party . . . who was not a party to the initial provocative act" (*id.* at p. 874). Instead, the murder "was an independent intervening act on which defendant's liability for the murder could not be based." (*Ibid.*) Here, Dania's shooting at defendant (thus killing Hall) was a direct and immediate response to defendant's shooting at Dania. There was no independent intervening act, no temporal separation, and no direct involvement of other actors in Hall's death, as was the case in *Cervantes*. "[W]hile provocative act murder has traditionally involved cases where the defendant instigates a gun battle, it is not

18

1

> by definition limited to such factual situations. *Neither its elements nor any case law interpreting this doctrine support such a limitation.*" (*People v. Lima* (2004) 118 Cal.App.4th 259, 268, italics added.)

2

3

> We find no deficiency in CALCRIM No. 560.

4

5   ECF No. 11-15 at 9-12.  Petitioner raised this claim in a petition for review to the California

6   Supreme Court (ECF No. 11-16) which was summarily denied (ECF No. 11-17).

7                    B.      Legal Standards

8           "[T]he fact that the instruction was allegedly incorrect under state law is not a basis for

9   habeas relief."  *Estelle v. McGuire*, 502 U.S. 62, 71-72 (1991).  Further, federal courts are bound

10  by state courts' determination that a particular instruction was or was not warranted under state

11  law.  *Bradshaw v. Richey*, 546 U.S. 74, 76 (2005) ("We have repeatedly held that a state court's

12  interpretation of state law, including one announced on direct appeal of the challenged conviction,

13  binds a federal court sitting in habeas corpus.").

14          Rather, the only pertinent question related to instructional error on federal habeas review

15  is "whether the ailing instruction by itself so infected the entire trial that the resulting conviction

16  violates due process."  *Estelle*, 502 U.S. at 72 (quoting *Cupp v. Naughten*, 414 U.S. 141, 147

17  (1973)).  In conducting this review:

18

> [T]he instruction may not be judged in artificial isolation, but must be considered in the context of the instructions as a whole and the trial record. . . . In addition, in reviewing an ambiguous instruction such as the one at issue here, we inquire whether there is a reasonable likelihood that the jury has applied the challenged instruction in a way that violates the Constitution. And we also bear in mind our previous admonition that we have defined the category of infractions that violate fundamental fairness very narrowly.

19

20

21

22

23  *Id.* at 72-73 (internal quotation marks and citations omitted).

24                   C.      Analysis

25          As an initial matter, the state appellate court's determination that the instigation element

26  urged by petitioner was not required under California law is dispositive.  As noted *supra*, this

27  court may not second-guess state courts in questions of state law.  And states have broad

28  discretion to define the elements of state-law crimes.  *See Patterson v. New York*, 432 U.S. 197,

1    207-208 (1977); *see also Illinois v. Vitale*, 447 U.S. 410, 416 (1980) ("We accept, as we must, the

2    Supreme Court of Illinois' identification of the elements of the offenses involved here."); *Brecht*

3    *v. Abrahamson*, 507 U.S. 619, 635 (1993) ("The States possess primary authority for *defining* and

4    enforcing the criminal law.") (emphasis added).  Even petitioner concedes that "no [California

5    state] case appears to have expressly held that instigating the chain of events is an element of

6    provocative act murder." ECF No. 1 at 51.  He nevertheless contends that a reading of the

7    relevant California case law makes clear that the requirement exists.  ECF No. 1 at 51.  This court

8    is plainly prohibited from making such weighty state law pronouncements – that is, most

9    appropriately, the role of the California Supreme Court.  And that court rejected petitioner's

10    argument when it summarily denied his petition for review.

11        Moreover, in light of the court's findings regarding the first claim – that the jury could

12    have convicted petitioner under either the malice or the provocative act theory – this court cannot

13    definitively say that the omission of this element, even if it was error, had a substantial and

14    injurious effect on the verdict.  *See Brecht*, 507 U.S. at 623.  And petitioner's burden to show

15    prejudice in this case is especially high.  The Supreme Court has held that "[a]n omission, or an

16    incomplete instruction, is less likely to be prejudicial than a misstatement of the law." *Henderson*

17    *v. Kibbe*, 431 U.S. 145, 155 (1977).

18        This claim should be denied.

19        III.    Erroneous Instruction on Adoptive Admissions

20        In his final claim, petitioner argues that the trial court erred when it misinstructed the jury

21    on adoptive admissions under California law.

22            A.    State Court Decision

23        The state court of appeal rejected this claim on direct review:

24            Defendant contends the trial court misinstructed the jury on adoptive
            admissions (Evid. Code, § 1221). We disagree with this contention.

25

26        A. Background

27            When defendant was first questioned at the hospital while he was
            being treated for his wound, he had denied driving to the lounge that
            night. His car later was identified in the parking lot, with the bloody
28            .380 Beretta pistol under it. On July 17, 2014, detectives Tracy and

                                        20

Rose went to defendant's house to speak with him and to obtain a DNA sample. On direct examination, Tracy testified defendant's hand and forearm were still bandaged. Defendant told the detectives that he did not have "good detail" about where he had been when he was shot. Defendant gave them a DNA sample. Near the end of their conversation, Tracy told defendant that a gun had been found under his car "and I asked him for an explanation for the gun being found under his car." Defendant remained mute, neither answering the question nor asking about the gun, nor denying knowing about the gun. The detectives left without arresting defendant.

On cross-examination, Tracy testified that defendant had been cooperative and allowed the DNA swab, and that defendant's mother had been present for most of the conversation. He testified "I told him that we had found a gun under his car, and that we would like to discuss that issue with him. But since his mom had gone upstairs, I told him that -- I waited for her to leave so I didn't front him off [sic] in front of his mother." Later, when cross-examined about prior testimony on the subject he had given,[11] Tracy testified as follows:

"Q. And before I ask the question, Mr. Martinez's mom, she left the room just for a moment right, and she came back?

"A. That's correct.

"Q. Okay. And do you recall testifying the last time that 'I told' -- 'I told him,' Mr. Martinez, 'that we had recovered that firearm and were aware that it was under his car'? Do you remember telling him that?

"A. Yes.

"Q. And you said that this morning [i.e., on direct], correct?

"A. Correct.

"Q. And then you said, 'and that I asked him or I told him that at some point he would' -- 'we would like to discuss that with him, but we didn't want to do that in front of his mother, who had been in the room but had walked upstairs for a moment,' right?

"A. That's correct.

"Q. And then she came right back?

"A. That's correct.

"Q. And so you never asked him if he could explain why that gun was there at that point?

"A. At that point?

"Q. Right.

---

[11] [**footnote seven in original text**]

21

"A. Correct.

"Q. And that's when you were asked, did Mr. Martinez respond to you at all. [¶] Do you remember that?

"A. Correct.

"Q. And that's -- that's when you said the last time he didn't say anything, he just looked at me?

"A. Correct."[12]

Over a defense objection, the jury was given the pattern instruction on adoptive admissions, CALCRIM No. 357.

The prosecutor argued to the jury that when asked about a gun found under his car, "the average person, a normal person, a person who hadn't ditched that gun under his own car would say what, what? What do you mean?" Instead of saying, "I have no idea what you are talking about," defendant said nothing. Defense counsel emphasized the lack of a recording of the exact words spoken and invited the jury to infer defendant understood the detectives did not want to embarrass him in front of his mother, but would ask him about the gun another time.

B. Analysis

The evidence outlined above raised a conflict of sorts about whether or not an adoptive admission had in fact been made--and it is exactly that conflict the jury was instructed to resolve.

The pattern instruction (CALCRIM No. 357) did not compel the jury to draw any inference, but instead allowed it to find an adoptive admission if it found defendant (1) understood the statement and (2) would "under all the circumstances, naturally have denied the statement if he thought it was not true" and (3) "could have denied it but did not." This accords with the rule that a "direct accusation in so many words is not essential." (*People v. Fauber* (1992) 2 Cal.4th 792, 852.)

Thus, if the jury found defendant felt unable to reply to the implied accusation or understood from Tracy's phrasing that the detectives were going to ask him about it at another time, so as not to upset his mother or embarrass him in front of her, the jury would not have found an adoptive admission. The record does not support defendant's evident view that his ability to speak freely to the officers--and deny the charge against him--necessarily was impaired by his mother's presence. Therefore, the jury was properly delegated the task to determine whether "under all the circumstances," including his youth, his mother's presence, and the phrasing actually

---

[12] [**footnote eight in original text**] There was no further testimony from Tracy about this subject. Detective Rose did not testify about the alleged adoptive admission, but confirmed defendant was cordial and cooperative at his home, and voluntarily gave a DNA sample.

1        used by Tracy, defendant could and would naturally have denied the implied accusation that he had had a gun.

2

3        In any event, the defense argument for prejudice is unconvincing. Counsel claims the adoptive admission was "an 'evidentiary bombshell,'" a characterization with which we disagree. The admission, even if taken as such, was not to the fact defendant shot anybody, but to the fact that he knew a pistol was under his car. Far more incriminating was the fact that defendant's *blood* was on the .380 pistol found under his car (the only one of the many firearms at the scene of that caliber), *and* on a nearby .380 shell casing, by a group of ejected .380 cartridges fired from that same pistol. Given that defendant had been shot through the hand, the conclusion that he fired the pistol that night seems highly probable. We agree with the Attorney General that what defendant did or did not say to the detectives about the pistol under his car was not a critical piece of evidence and did not tip this case in the People's favor.

10        Further, defendant hinges his prejudice claim on the provocative acts theory, arguing it bolstered the People's "extremely weak case" on that theory. But he makes no argument about how any purported error respecting this instruction or evidence impacted the People's alternate theory of liability. (See Part I, *ante*.) Again, we will not make arguments for him. (See *People v. Stanley*, *supra*, 10 Cal.4th at p. 793.)

14        Accordingly, even if we were to find error, it would be harmless under any standard.

16 ECF No. 11-15 at 12-16.  Petitioner raised this claim in a petition for review to the California

17 Supreme Court (ECF No. 11-16) which was summarily denied (ECF No. 11-17).

18        B.     <u>Legal Standards</u>

19    The legal standards regarding instructional error, set forth *supra* in the foregoing section,

20 also apply here.

21        C.     <u>Analysis</u>

22    As with the foregoing claim regarding instructional error, the state appellate court's

23 finding that the jury was not misinstructed under state law is binding on this court.  *See Bradshaw*

24 546 U.S. at 76.  Thus, the only question is whether the alleged error in instruction "by itself so

25 infected the entire trial that the resulting conviction violates due process." *Estelle*, 502 U.S. at 72.

26 The court cannot reach that conclusion.

27 /////

28 /////

The instruction at issue read:

> If you conclude that someone made a statement outside of court that accused Salvador Martinez of the crime charged in Count 1 or tended to connect him with the commission of the crime charged in Count 1 and he did not deny it, you must decide whether each of the following is true:
>
> 1. The statement was made to him or made in his presence;
>
> 2. He heard and understood the statement;
>
> 3. He would, under all circumstances, naturally have denied the statement if he thought it was not true;
>
> AND
>
> 4. He could have denied it but did not.
>
> If you decide that all of these requirements have been met, you may conclude that Salvador Martinez admitted the statement was true.
>
> If you decide that any of these requirements has not been met, you must not consider either the statement or his response for any purpose.
>
> You must not consider this evidence in determining the guilt of any other defendants.

ECF No. 11-3 at 57.  Petitioner argues he was prejudiced by the foregoing instruction insofar as:

> The foundation for giving this instruction based on Tracy's shifting testimony, the lack of any corroboration of his claims about what occurred and the words used and the situation itself, all dictate that the instruction should not have been given and the prosecutor should not have been permitted to shore up the weaknesses in his case with conduct that he tried to convert into an admission of guilt.

ECF No. 1 at 59.  But, as the appellate court noted (and the language plainly shows), the instruction did not mandate that the jury draw any inference vis a vis the question of adoptive admission.  ECF No. 11-15 at 15-16.  If, as petitioner argues, the case for finding an adoptive admission as weak, the jury was equipped and empowered to make that determination.  The Supreme Court has held that jurors are well equipped to analyze factual evidence and reject a theory of guilt that is factually inadequate.  In *Griffin v. United States*, the Supreme Court stated:

> Jurors are not generally equipped to determine whether a particular theory of conviction submitted to them is contrary to law -- whether, for example, the action in question is protected by the Constitution,

1

2

3

4

  is time barred, or fails to come within the statutory definition of the crime. When, therefore, jurors have been left the option of relying upon a legally inadequate theory, there is no reason to think that their own intelligence and expertise will save them from that error. *Quite the opposite is true, however, when they have been left the option of relying upon a factually inadequate theory, since jurors are well equipped to analyze the evidence* [.]

5 502 U.S. 46, 59 (1991) (emphasis added).  Thus, the court cannot conclude that the provision of

6 this instruction meets the standard for prejudice set forth *supra*.

7               CONCLUSION

8   For the reasons explained above, the state courts' denial of petitioner's claim was not

9 objectively unreasonable within the meaning of 28 U.S.C. § 2254(d).  Accordingly, IT IS

10 HEREBY RECOMMENDED that the petition for writ of habeas corpus be denied.

11   These findings and recommendations are submitted to the United States District Judge

12 assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l).  Within fourteen days

13 after being served with these findings and recommendations, any party may file written

14 objections with the court and serve a copy on all parties.  Such a document should be captioned

15 "Objections to Magistrate Judge's Findings and Recommendations."  Any reply to the objections

16 shall be served and filed within fourteen days after service of the objections.  Failure to file

17 objections within the specified time may waive the right to appeal the District Court's order.

18 *Turner v. Duncan*, 158 F.3d 449, 455 (9th Cir. 1998); *Martinez v. Ylst*, 951 F.2d 1153 (9th Cir.

19 1991).  In his objections petitioner may address whether a certificate of appealability should issue

20 in the event he files an appeal of the judgment in this case.  *See* Rule 11, Rules Governing Section

21 2254 Cases (the district court must issue or deny a certificate of appealability when it enters a

22 final order adverse to the applicant).

23 DATED:  May 13, 2020.

24

25       EDMUND F. BRENNAN
        UNITED STATES MAGISTRATE JUDGE

26

27

28